IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Mitchell J. Pettinato, #218405, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | C.A. No.: 2:05-1226-PMD-RSC |
| v. | ) | |
| | ) | **ORDER** |
| Willie Eagleton, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| ———————————————— | ) | |

This matter is before the court upon the Magistrate Judge's recommendation that Respondent's Motion for Summary Judgment be granted in Mitchell J. Pettinato's ("Pettinato" or "Petitioner") petition under 28 U.S.C. § 2254. The record includes a report and recommendation ("R&R") of the Magistrate Judge, which was made in accordance with 28 U.S.C. § 636(b)(1)(B). A petitioner may object, in writing, to an R&R within ten days after being served with a copy of that report. 28 U.S.C. § 636(b)(1). Petitioner sought and obtained an extension of time in which to file objections, and his timely objections were filed on October 5, 2007.

## BACKGROUND

Although the Magistrate Judge thoroughly detailed the background and history of this case, the court will do so again here for the sake of completeness.

Pettinato is confined at the Allendale Correctional Institution of the South Carolina Department of Corrections. In 1994, a Spartanburg County grand jury indicted Pettinato for murder and possession of a firearm during the commission of a violent crime. Attorney Don Thompson represented Pettinato at a jury trial before the Honorable J. Derham Cole on November 28, 1994. After the presentation of testimony but prior to final arguments, Pettinato withdrew his plea of not

1

guilty and entered a plea of guilty but mentally ill.  On November 30, 1994, Judge Cole sentenced

Pettinato to life for murder and five years for possession of a firearm during the commission of a

violent crime, to run concurrently.  Pettinato did not appeal his guilty plea or sentence.

On February 22, 1995, Pettinato filed his first application for post-conviction relief ("PCR")

in state court. (95-CP-42-379), wherein he alleged the following 21 grounds for relief:

1. Ineffective assistance of counsel;
2. Denied due process of law;
3. Denied the right to be fully heard;
4. Denied the right to cross examine the witnesses against me when such cross examination would have proven in most cases that witnesses were committing perjury;
5. Although I cannot find anything in the law books regarding the behavior of the Judge and/or Prosecutor I do accuse the prosecution, acting improperly, if not plain unlawfully and using their positions to intimidate me, both while court was in session and in recess, this I believe denied me equal protection under the law;
6. Murder was an overcharge of the actual incident and correct charge should have been manslaughter;
7. Denied the right to speak while at my arraignment on charge of murder;
8. Defense did not adequately investigate my case nor did they subpoena evidence that I asked for;
9. I would like to challenge the validity have [sic] having the same punishment for someone found guilty but mentally ill as someone found guilty in that guilty but mentally ill shows that a person is unable to conform to the law due to no fault of there [sic] own;
10. Failure to provide me with any warrants and/or indictments relating to the four gun charges;
11. Not advised of right to appeal;
12. Counsel failed to object to improper and false statements made by the prosecutor which prejudiced the jury;
13. Counsel failed to conduct a proper investigation both factual and legal, to determine if matters of defense could be developed, and to allow himself enough time for reflection and preparation for trial;
14. Counsel failed, after plaintiff's request to obtain or attempt to obtain a psychiatric evaluation by an independent psychiatrist where there was reasonable cause to believe that the report of the examining psychiatrist, who was employed by the State, was prepared for the prosecution's benefit and the evaluation was not properly conducted.  Counsel should have known that plaintiff was entitled to an independent psychiatrist, under 18 U.S.C.

§3006A(c), who could supply expert services "necessary" to an adequate defense;

15. Counsel failed to move the court as to a reduced charge of voluntary manslaughter, while court was in session, although counsel claimed that he did, during recess, and the judge denied his request. This occurred just prior to guilty plea being entered;

16. Counsel gave erroneous advice when he told plaintiff that the court would only allow the jury to consider "not guilty," "guilty," and "guilty but mentally ill" as the only verdicts, and counsel should have known that "not guilty by reason of insanity" should have included or that plaintiff stood a good chance for a reversal on appeal. This erroneous advice coerced the plaintiff into pleading "guilty but mentally ill." Counselor [sic] was ineffective when he allowed a plea of "guilty but mentally ill," without objection, when motions were before the court and were not ruled upon prior to the entering of the plea of "guilty but mentally ill;"

17. Counsel failed to request the charge on murder v. manslaughter required by State v. King;

18. Denied "due process of law" – Plaintiff was denied "due process of law" as he was incompetent to stand trial and was not criminally responsible for his actions due to mental illnesses...;

19. Abuse of discretion – it was "abuse of judicial discretion" to allow plaintiff to stand trial for three gun charges that were brought to plaintiff's attention for the first time at his trial;

20. White v. State Review – Plaintiff is seeking, and believes he is entitled to a "White v. State Review" so he may raise his appealable issues, as Plaintiff did not knowingly and intelligently waive his right to direct appeal. Rule 227(6) Appellate Court Rules;

21. Plaintiff contends that he is being held in custody illegally as he is unable to legally plead guilty but mentally ill, and he cannot be held responsible for his actions when he wasn't fully aware of what he was doing and did not have sufficient internal controls over his actions to conform them to the requirements of the law.

On March 20, 1996, the Honorable Paul M. Burch held an evidentiary hearing, at which

Attorney Michael Duncan represented Pettinato. Pettinato testified on his own behalf and called his

trial attorney to testify. Thereafter, on April 26, 1996, Judge Burch issued an order of dismissal,

dismissing the application in its entirety. Following this dismissal, Pettinato filed a timely notice

of appeal. On October 8, 1996, Pettinato's attorney, Lisa T. Gregory, filed a *Johnson* petition for

a writ of certiorari and a petition to be relieved as counsel. By Order dated February 21, 1997, the

South Carolina Supreme Court denied the *Johnson* petition and granted counsel's request to withdraw.

On August 4, 1997, Pettinato, proceeding *pro se,* filed his first federal habeas corpus petition. On November 3, 1997, Pettinato filed a motion to hold the matter in abeyance to allow him to file a second PCR action to allege, *inter alia*, ineffective assistance of counsel at the PCR hearing and on appeal. On March 26, 1998, then Magistrate Judge, now United States District Judge, Margaret B. Seymour denied Pettinato's motion to stay. Pettinato then moved, on May 4, 1998, to dismiss his habeas corpus petition without prejudice pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure. This court granted Pettinato's motion and dismissed the petition on September 29, 1998.

Meanwhile, on November 6, 1997, Pettinato filed his second PCR application in state court, alleging, *inter alia*, ineffective assistance of trial counsel, ineffective assistance of PCR counsel, ineffective assistance of appellate counsel, and involuntary guilty plea. The Honorable Lee S. Alford held an evidentiary hearing on March 28, 2000. On June 19, 2000, Judge Alford filed an order dismissing Pettinato's second PCR application, finding that the petition was barred as successive and that Pettinato failed to present evidence to support his claim that his PCR attorney was ineffective. The South Carolina Supreme Court dismissed Pettinato's appeal.

On May 26, 2000, Pettinato filed his second federal habeas corpus petition. On August 29, 2000, Pettinato again moved for dismissal without prejudice. On September 25, 2000, this court granted Pettinato's motion.

Subsequently, on January 10, 2001, Pettinato filed his third PCR application, alleging ineffective assistance of trial counsel, involuntary guilty plea, violation of due process, and the state court's lack of subject matter jurisdiction over his criminal case. On September 3, 2003, the

4

Honorable J. Michael Baxley held an evidentiary hearing, at which Attorney N. Douglass Brannon represented Pettinato. Thereafter, on November 3, 2003, Judge Baxley filed an order denying Pettinato's third PCR application as successive and time-barred.

On March 18, 2004, Pettinato's attorney, Aileen Clare, filed a *Johnson* petition for writ of certiorari and petition to be relieved as counsel. Pettinato filed a *pro se* brief on appeal. On February 3, 2005, the South Carolina Supreme Court entered its Order denying the petition for writ of certiorari and granting counsel's request to be relieved. The Remittitur was sent down on February 22, 2005.

Finally, on April 28, 2005, Pettinato filed the present habeas corpus petition pursuant to 28 U.S.C. § 2254, alleging numerous grounds for relief. Pettinato amended his petition on June 27, 2005. His § 2254 petition alleges numerous grounds for relief (verbatim):

A) Petitioner was denied his Sixth Amendment right to the effective assistance of counsel wherein counsel failed to obtain an expert in psychiatry to assist the defense with respect to Petitioner's competency to stand trial and sanity at the time of alleged offense after being requested to obtain same and when an expert was available and willing to assist Petitioner.

1) Counsel was made aware of Petitioner's history for treatment of mental illnesses from 1989 through the date of the alleged incident.

2) Counsel obtained Petitioner's mental health records and had them available to him prior to trial.

3) As a result of what was known to counsel, from reviewing the mental health records, speaking to others concerning Petitioner's mental health problems, and speaking with Petitioner, counsel knew that Petitioner's competency to stand trial and his sanity at the time of the alleged incident were a substantial and significant question.

4) Counsel was aware that attorney Michael Bartosh had filed a motion to have Petitioner examined and Petitioner was sent to the William S. Hall Institute for evaluation by at least two (2) State Psychiatrists, that those psychiatrists found Petitioner competent and criminally responsible, and that a competency hearing was

5

eventually going to be held as required by law, so an adequate determination could be made regarding Petitioner's competency to stand trial.

5) Among other things, counsel was aware that the reports of the psychiatrists for the State were most likely prepared for the benefit of the prosecution as the diagnosis of the State differed significantly from the diagnosis received by those psychiatrists whom had been treating Petitioner in the past.

6) Petitioner's mother notified counsel that she was trying to obtain a psychiatric expert to examine Petitioner, that she made an initial payment to that expert, and, that the expert was willing and available to assist Petitioner.

7) Petitioner also asked counsel to obtain an expert to have Petitioner evaluated, however counsel ignored Petitioner after learning that Petitioner wanted a court appointed defense psychiatrist.

8) Counsel unreasonably failed to obtain a psychiatric expert to evaluate Petitioner's competency to stand trial, sanity at the time of the alleged offense, and, to assist in the examination, preparation and presentation of the defense when an expert had already agreed to assist Petitioner, was available, counsel was notified of this, and counsel intended to pursue the insanity defense at trial.

9) Petitioner was prejudiced by counsel's conduct in that the Petitioner was tried, entered a guilty plea, waived Constitutional rights, and was convicted and sentenced to life imprisonment, when he was not competent, or, there was a reasonable doubt as to his competency to understand and waive his Constitutional rights.

10) Petitioner was also prejudiced in that he went through trial without the assistance of an expert in psychiatry and was not permitted a full and fair opportunity to put the findings of the State's experts to an adversarial form of testing or offer evidence from his own expert to support the insanity defense.

B) Petitioner's counsel provided ineffective assistance wherein counsel unreasonably stipulated to Petitioner's competency to stand trial and waived Petitioner's right to a full and fair competency hearing when the facts known to counsel raised a substantial question as to Petitioner's competency and there was a substantial doubt as to Petitioner's competency.

1) Petitioner appeared at a competency hearing shortly before trial.

2) No witnesses were called, Petitioner was not questioned, and, counsel took it upon himself to unreasonably stipulate that the Petitioner was competent.

3) The trial Judge found that Petitioner was competent, based upon counsel's stipulation, the reports of the State's experts, and, a State expert being present to testify that Petitioner was competent.

4) Counsel then raised an issue regarding the question of Petitioner's competency, was admonished by the trial judge for raising the issue after stipulating to Petitioner's competency, and counsel then claimed that Petitioner was competent but that his understanding was "slow."

5) Counsel stated that he would only say that Petitioner was not competent if Petitioner had "absolutely no understanding whatsoever," and that is not the correct standard.

6) Counsel unreasonably stipulated to Petitioner's competency to stand trial in spite of what was known to counsel at that time, without the benefit of an opinion from a defense psychiatrist or having Petitioner examined by an independent or defense psychiatrist, even though Petitioner's competency exam by the State Psychiatrists occurred some four and one-half (4½) months earlier, occurred after Petitioner had been stabilized on anti-psychotic medication, and when counsel knew that Petitioner had stopped taking his medications and had difficulty understanding and retaining in memory what was going on around him and what he was told.

7) The trial judge found that Petitioner was competent, based on the stipulation of trial counsel and government experts' reports while Petitioner was provided no full and fair opportunity to contest those reports or present further evidence raising a reasonable doubt as to Petitioner's competency.

8) Petitioner was prejudiced in that he was not competent, did not have an understanding of the law in relation to the facts, was denied his right to put the State's finding of competency to an adversarial form of testing, and was convicted at a time that he was either not competent or that there was a bona fide doubt as to his competency.

C) Counsel provided ineffective assistance wherein he failed to conduct an adequate factual and legal investigation, failed to keep Petitioner fully informed, misled Petitioner, and withheld vital information from Petitioner.

1) Prior to trial, counsel possessed the trial file, which contained materials gathered by other Public Defenders, such as Charles Sanders, Thomas Dillard, and Michael Bartosh, who were appointed to represent Petitioner on various matters since the date of Petitioner's arrest.

2) The file contained, among other things, notes, written police reports, statements to police made by alleged witnesses to the alleged incident, discovery

material obtained from the prosecution, some of Petitioner's medical records, correspondence between the Public Defenders Office and various individuals, and, the results of a gunshot residue test that had been conducted on Petitioner's hands.

3) Counsel failed to share the information contained in the file with the Petitioner, never at any time informed Petitioner as to the existence of the exculpatory evidence contained in the file and the nature of its value to the Petitioner, and Petitioner never at any time knew of the existence or contents of the file.

4) Counsel unreasonably and erroneously failed to conduct a further investigation based on what he should reasonably have known from the documents and other evidence contained in the file, and continued to insist that Petitioner's only defense was the insanity defense and further withheld all of the vital information from the Petitioner so as to prohibit Petitioner from taking part in any of the important decisions regarding Petitioner's trial, defense and Federal Constitutional rights.

5) Petitioner was prejudiced by counsel's unprofessional and erroneous conduct in that the exculpatory and impeachment evidence contained in the file, or which also would have been learned through a diligent investigation, would reasonably have changed the entire outlook of the trial.

6) Petitioner was prejudiced in that he had no opportunity to assist in making a decision as to his defense theory or an opportunity to call additional witnesses, to obtain experts in psychiatry, ballistics and gunshot powder residue, or to make other important decisions regarding the trial process.

7) Had Petitioner been informed of the existence and the value of these documents, Petitioner would not have cooperated with counsel's defense theory or strategy and would not have proceeded to trial under the insanity defense theory, would not have testified and incriminated himself, would have called additional witnesses, would have used the documents to impeach the State's witnesses, would have sought experts to support a defense of not guilty, and would never have entered a plea of GBMI to murder.

8) Counsel should reasonably have been aware that he had a duty to keep Petitioner fully informed about important matters that came to counsel's attention prior to trial and during trial, including any and all potential defenses, all exculpatory evidence or evidence that could be used to impeach state witnesses, any evidence that would tend to raise a reasonable doubt as to Petitioner's guilt, and, any information that would allow Petitioner to take part in the decisions related to trial and defense matters, matters as to who to call as witnesses and what experts to obtain for the defense.

8

9) Counsel unreasonably failed in that duty as he failed to keep Petitioner fully informed concerning important trial matters and withheld all of the vital information that Petitioner needed in order to participate in his trial and defense and in order for Petitioner to make intelligent decisions whether to invoke or waive his Constitutional rights.

10) Petitioner made numerous requests to obtain his file and was never provided his file until approximately May 11, 2000, long after the trial was over, the withholding of information was used to induce or otherwise coerce a guilty plea, and Petitioner's post-conviction relief process was over with.

11) As a result of counsel's unreasonably and unprofessional conduct, Petitioner was denied a fair trial, was denied his right to the assistance of counsel, and his right to call witnesses in his favor was abridged.

D) Counsel provided ineffective assistance wherein counsel failed to file an appeal, failed to inform Petitioner of the means and method for perfecting an appeal, and misled Petitioner concerning his appeal rights.

1) Counsel continually stated during trial that Petitioner was not being given a fair trial and that counsel would appeal.

2) Petitioner agreed with counsel that counsel should appeal, each time that counsel stated that "they're not doing you right."

3) Counsel never filed the appeal, never provided Petitioner with the information concerning the means, method, or time limit for filing an appeal, and he knew that Petitioner wanted his appeal.

4) Petitioner called counsel's office on the day of the plea to inquire into his appeal.

5) Counsel did tell Petitioner just before the entering of the guilty plea, that he would file an appeal and would "probably testify for you on appeal,"' and Petitioner reasonably expected counsel to file an appeal, raise the Constitutional violations that had occurred, and assure that Petitioner received the assistance of appellate counsel.

6) Petitioner sent counsel letters from the SCDC, beginning within the ten (10) day limit for filing the appeal, in which he inquired into his appeal and requested counsel to send Petitioner the trial file if counsel was not going to file an appeal.

7) Petitioner never received a reply and Petitioner could not file an appeal

9

because he did not know of the means, method or time limit for filing the appeal, and when he learned of the time limit for filing the appeal, the SCDC refused to allow him access to the law library or someone who could assist in perfecting an appeal.

8) Petitioner attempted to file the appeal by writing to the Clerk of Court for Spartanburg County only to be informed that the time limit had expired and that Petitioner most likely could not obtain a waiver to file an appeal.

9) As a result of counsel's conduct, Petitioner lost his right to appeal and his right to counsel on direct appeal.

E) Petitioner was denied his Sixth and Fourteenth Amendment right to a fair trial.

1) Petitioner was informed by counsel, some one or two weeks prior to trial, that the State was thinking of indicting Petitioner for using a firearm during the commission of a violent crime.

2) At no time did any of the appointed attorneys share any information with Petitioner as to the existence of the documents contained in the trial file or obtained from the prosecution.

3) Petitioner proceeded to a trial by jury on November 28, 1994 wherein Petitioner's counsel and later the Petitioner, were first given notice of two (2) additional gun charges that had allegedly been presented to the grand jury.

4) Petitioner had no prior notice whatsoever that he was going to be indicted and charged with two (2) additional gun charges and was never served with indictments related to these charges.

5) Counsel objected based on Due Process grounds that there was no notice, that it violated Due Process for a man to be called to trial on charges and served with those charges at the commencement of trial, and that the court lacked jurisdiction over those charges.

6) The trial judge overruled counsel's objections and ruled that the Court had jurisdiction and Petitioner's counsel should have been aware that the charges would be brought.

7) The trial judge also held that Petitioner should have been aware that since a gun was used to shoot the victim, that Petitioner had to have unlawfully carry the pistol and had to point the pistol, and therefore, this justified the charges being brought at the commencement of trial.

8) Petitioner was then arraigned on all charges, asked about his understanding

10

of the charges and whereas Petitioner was confused, could not recall what the charges were, and did not understand why the charges were brought, Petitioner simply stated, "just go on and do what you are going to do."

9) A competency hearing commenced, which consisted of counsel stipulating to Petitioner's competency to stand trial and the trial judge unreasonably ruled that Petitioner was competent, without making an adequate inquiry and when there was a reasonable probability that Petitioner was not competent.

10) Petitioner was not questioned, there were no experts called to testify for the State or for the Petitioner, Petitioner's only exam to determine his competency occurred at the hands of State experts some four (4) months prior to trial, and Petitioner did not waive his right to a full and fair competency hearing or to have a defense expert examine him and assist in what he was told was his only defense.

11) Petitioner proceeded to trial by jury and counsel informed the jury that Petitioner committed the offense but that the jury should consider what Petitioner's state of mind was at the time of the alleged offense. Counsel was proceeding under his theory that the defense of insanity was Petitioner's only defense.

12) Counsel continually informed the Petitioner that he was not receiving a fair trial and that counsel would appeal.

13) During the trial the trial judge intimidated Petitioner by having a bailiff/jail guard inform Petitioner that if he were to "go off," that the trial judge would have Petitioner taken out in chains and chained to a wall in the next room where the Petitioner would then listen to his trial over an intercom system.

14) Petitioner was intimidated and scared as Petitioner did not understand and believed that he was going to be chained up on a wall.

15) Petitioner's perception of the matter at that time, because of having no prior experience and because of his mental condition, was that he should do nothing and try to obtain help on appeal or he would be punished.

16) During trial, some of the State's witnesses and friends of Petitioner's wife, made threats to Petitioner and Petitioner's family of which Petitioner heard while Petitioner was sitting at the defense table and this also intimidated Petitioner.

17) Petitioner attempted several times to speak to counsel while trial was in process and counsel only kept informing Petitioner to keep quiet.

18) Petitioner started having hallucinations and then believed that counsel, the prosecutor and the judge had conspired to deprive him of a fair trial, and, that he

should go along with what was taking place and then seek assistance on appeal, or he would be punished.

19) Petitioner reasonably believed that he had no other choice other than to testify in an attempt to challenge the false and hearsay testimony of the State's alleged witnesses, to find a way to admit that he shot his wife, but didn't know what he was doing so as to attempt to add some support to the insanity defense theory, and Petitioner relied on the previous testimony of some of the witnesses, what he had heard on the news and read in newspapers, and some of what he could recall, when he testified.

20) After Petitioner and the rest of the defense witnesses finished testifying, a recess was taken and Petitioner was told by his counsel that the trial judge was not going to charge the jury as to the defense of insanity or manslaughter and was only going to charge the jury as to guilty, guilty but mentally ill (GBMI), and not guilty.

21) The trial judge unreasonably and unlawfully deprived the Petitioner of his Federal Constitutional right to put up a defense, while knowing that the insanity defense was Petitioner's sole defense and after hearing Petitioner testify and incriminate himself based on that defense.  He also ruled that the jury could find Petitioner guilty based on two (2) verdicts while only allowing the jury one (1) verdict in which to find Petitioner not guilty, all in violation of State Statutes and Petitioner's Sixth and Fourteenth Amendment right to have the jury consider his theory of defense.

22) Petitioner was prejudiced in that had he been provided a fair trial, had the effective assistance of trial counsel, been kept fully informed, and had not been intimidated by the trial judge, he would have assisted in the trial process, assisted with making important decisions, completed the trial process and then appealed, and, would have never entered a plea of guilty or GBMI to murder.

F) Petitioner's Guilty Plea violated Due Process because the plea was not entered knowingly, voluntarily and intelligently, was entered at a time that Petitioner was not legally competent and did not have an understanding of the consequences of the plea, was coerced, and, was entered because of the ineffective assistance of trial counsel.

1) Petitioner re-asserts and repeats all grounds and supporting facts as stated in this Petition, in the accompanying Affidavit, and in the accompanying Memorandum of Law, as if repeated verbatim herein.

2) After Petitioner learned that his defense was unlawfully stripped from him, and based on everything that was known to Petitioner at that time, Petitioner wanted to complete the trial process and begin the appeal process as soon as possible.

12

3) Counsel discussed with Petitioner, the matter concerning the plea offer of the Solicitor and Petitioner responded that he did not want to plead guilty.

4) Counsel informed Petitioner that he had at least two (2) strong issues for appeal which were that the trial judge refused to charge the jury as to insanity or voluntary manslaughter and calling his case on the gun charges without notice, and stated that if he went ahead and entered the plea that counsel would "probably testify for you on appeal."

5) Counsel also informed Petitioner that the other gun charges would be dismissed, that the trial judge would sentence Petitioner to life for murder and five (5) years concurrent for the one (1) gun charge so Petitioner would be eligible for parole, and, that Petitioner would be eligible for something called work release.

6) Counsel then informed Petitioner that he had to hurry because the Solicitor could withdraw the plea offer at any time and the judge was getting ready to call Petitioner and counsel back into court to continue with the trial.

7) Petitioner's mother asked Petitioner, in the presence of counsel, if it was legal for the trial judge to take away his defense, to which Petitioner said, "I guess so because he just did it to me."

8) Petitioner asked counsel "what should I do?" Counsel simply stated, "it's up to you but you have to hurry."

9) Petitioner asked again, "what should I do," however, counsel never provided Petitioner with any advice and simply stated, "It's your decision, let me know what you're going to do because we have to get back into the court room right now." Petitioner then stated, "O.K., let's do it." Counsel asked, "do what?" Petitioner responded, "let's do this and get this over with because I have to get out of here."

10) Petitioner and counsel went into the courtroom and the judge asked Petitioner questions regarding the entering of a guilty plea.

11) Petitioner answered the questions so the case would be over with, the appeal process could begin, and based on what he understood.

12) At the time of entering the plea, Petitioner understood that he had at least two (2) issues for appeal that would most likely have reverse his conviction, two (2) of those issues being: (1) that he had no prior notice of the additional gun charges before trial; and, (2) the trial judge's refusal to charge the jury regarding the insanity defense and voluntary manslaughter, after Petitioner invoked his right to testify and waived his Fifth Amendment right to self incrimination, based on the insanity

13

defense.

13) Petitioner understood that he could always raise violations of his Constitutional rights on appeal, that an appeal would be filed by counsel, that counsel would probably testify for Petitioner on appeal, and that Petitioner would be provided counsel for appeal.

14) Petitioner also understood that the other gun charges would be dismissed, that he would be eligible to be released upon parole, and, that after he was sent from a mental hospital to prison he would be eligible for something called work release.

15) Petitioner felt coerced into entering the plea of guilty because he was denied a fair trial, was told that he could not have the jury consider his defense after he had taken the stand and incriminated himself in support of that defense, and because he was not permitted to obtain a psychiatrist for the defense to examine him and explain to the jury about his mental illnesses, the memory problems, and the problems with him being in a dissociative state at times.

16) Petitioner also felt that he was coerced because of the gun charges that were added without any notice at the beginning of trial, because counsel had stated just prior to the plea that he was going to file an appeal and would probably testify for Petitioner on appeal, because the trial judge was going to allow the jury two (2) methods for finding Petitioner guilty and only one (1) method for finding the Petitioner not guilty, and, where counsel would not provide Petitioner with any advice when Petitioner asked, "what should I do."

17) Petitioner could not make a voluntary and intelligent decision when vital information contained in the trial file was withheld from him and neither counsel, nor anyone else, explained to him the value of the exculpatory evidence or what his rights were as far as obtaining experts to assist him.

18) If counsel would not have stated that he was going to file an appeal and would probably testify for Petitioner on appeal, then the Petitioner would not have entered a guilty plea as Petitioner did not wish to waive his right to a direct appeal, did not waive that right, and, there is no valid waiver of his right to appeal.

G) Petitioner was denied Due Process wherein he was denied his right to a meaningful and fair post-conviction relief procedure in which to adequately and properly litigate his claims for relief because he was not competent, the State unlawfully interfered with his ability to prosecute his case, the State failed to follow its own procedures, and, the State arbitrary and capriciously applied its laws to Petitioner.

1) Petitioner was taken to his first PCR hearing, on March 20, 1996, directly

14

from Gilliam Psychiatric Facility of the SCDC where he was being treated for paranoia, suicidal ideation, and depression.

2) While at the Gilliam Facility, Petitioner was provided with anti-psychotic medication, i.e, haledol, etc., and was taken off from the medication shortly before his hearing, was discharged from the facility at the convenience of the State so he could be taken to the hearing, was taken back to the facility for further treatment after the hearing was over, and was then taken back to his assigned institution some eight (8) after his treatment ended.

3) Petitioner was prohibited by the SCDC, from taking any of his legal material regarding the PCR matter, with him to the hearing and notified his PCR counsel and the trial judge of this fact.

4) Prior to the hearing, Petitioner made numerous requests to view his trial case file and obtain copies of the documents.

5) During the hearing Petitioner requested to view his PCR counsel's file and to obtain copies of the documents in that file, only to be informed that if he wanted a copy, he would have to contact trial counsel.

6) The State failed to properly follow its procedure and failed to allow all grounds to be raised adequately.

7) Petitioner filed a second PCR Application attempting to raise the ground that he was denied a full and fair PCR proceeding and his PCR was arbitrarily denied and dismissed.

8) Petitioner obtained his trial file on or about May 11, 2000 which contained evidence to support his grounds for relief raised in the first PCR, presented new supporting facts, and notified Petitioner of the existence of other grounds for relief.

9) Petitioner learned for the first time, of the existence of exculpatory evidence, evidence to impeach the State witnesses, and documents that would have permitted Petitioner to make an intelligent choice among the courses of action open to Petitioner concerning, among other things, his defense, his constitutional right to call witnesses for his defense, whether or not to testify and incriminate himself, and, whether or not to waive any of his Federal Constitutional rights.

10) Petitioner filed a third PCR based on the contents of the trial file, a hearing was held wherein Petitioner was arbitrarily and capriciously denied the right to testify and present evidence in his favor, and he was denied the right to develop the facts.

11) The PCR matter was then arbitrarily and capriciously denied and dismissed.

12) The State successiveness rule and limitations rule were both arbitrarily, capriciously and unreasonably applied to Petitioner so as to foreclose Petitioner's right to raise grounds for relief that he had no other opportunity to raise.

(Amended Pet. at 6-22.)

On January 6, 2006, Respondent Willie Eagleton ("Respondent" or "Eagleton") filed a motion for summary judgment, wherein he argued that Pettinato's entire petition "is without merit and must be dismissed either on the merits for claims actually raised and decided in the initial PCR action in 1997 or procedurally barred if sought to be raised in either the 1998 or 2000 state PCR actions or are not cognizable in a federal habeas corpus action." (Mem. in Supp. at 18.) Respondent only raised the issue of timeliness in his conclusion, where he asserted that any claim not raised in Pettinato's first PCR proceeding is procedurally barred or time-barred under S.C. Code Ann. § 17-27-45. (*Id*. at 35.) Pettinato filed his response in opposition to the motion for summary judgment on March 10, 2006. In an R&R dated June 19, 2006, Magistrate Judge Carr recommended dismissing Pettinato's § 2254 petition as untimely. Pettinato filed objections, and on September 21, 2006, this court found Pettinato was entitled to equitable tolling "due to his diligence and extraordinary circumstances." (Order at 6.) The court thus remanded the matter to the Magistrate Judge for a full consideration of the merits of Pettinato's § 2254 petition and the Respondent's Motion for Summary Judgment.

On October 26, 2006, a hearing was held before Magistrate Judge Carr at which Petitioner moved to amend his petition. Petitioner's motion was granted, and the Respondent was given time to supplement his summary judgment motion following the filing of the amended petition. However, on November 14, 2006, Pettinato notified the court that he had decided not to file an

16

amended complaint.

Respondent filed a second Motion for Summary Judgment on February 5, 2007, and Pettinato filed his Response in Opposition on April 26, 2007. On August 29, 2007, Magistrate Judge Carr issued an R&R that recommended granting Respondent's Motion for Summary Judgment. Pettinato filed objections on October 5, 2007.

## STANDARD OF REVIEW

### A.    Legal Standard for Summary Judgment

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990).

### B.    Magistrate Judge's R&R

This court is charged with conducting a *de novo* review of any portion of the Magistrate Judge's R&R to which a specific objection is registered and may accept, reject, or modify, in whole or in part, the recommendations contained in that R&R. 28 U.S.C. § 636(b)(1). After a review of the entire record, the R&R, and Petitioner's objections, the court finds that the Magistrate Judge fairly and accurately summarized the facts and applied the correct principles of law. Accordingly,

17

the court adopts the R&R and fully incorporates it into this Order.

## ANALYSIS

**A.    Section 2254 Petitions**

With respect to those claims that were adjudicated by the state court on their merits, habeas relief is warranted only if a petitioner can demonstrate that the adjudication of his claims by the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court explained that § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. *Id.* at 404-05. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Id.* at 405-06. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies it to the facts of the particular case. *Id.* at 407-08.

"The federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002). "The focus of the [unreasonable

18

application] inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal habeas court may not issue the writ under the "unreasonable application" clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411.

**B.    The Magistrate Judge's R&R**

The Magistrate Judge stated in his R&R that "[a] review of the record and relevant case law reveals that Petitioner is not entitled to habeas corpus relief." (R&R at 38.) The Magistrate Judge further stated, "Most of the ineffective assistance allegations concern nonjurisdictional matters which occurred prior to Petitioner's plea; these claims are waived by entry of Petitioner's guilty plea, if valid, and cannot be reviewed on the merits here." (*Id.*) Noting that the "initial question is whether the plea was valid," the Magistrate Judge then determined that Pettinato entered a valid guilty plea. (*Id.* at 39-46.) The R&R continued: "Although a valid plea waives all but jurisdictional challenges to events which occurred prior to the plea, a petitioner's claims of ineffective assistance of counsel are, however, reviewed to the extent that they impugn the validity of the plea itself." (*Id.* at 46.) The Magistrate Judge determined that Petitioner was unable to establish that the PCR court's decision regarding his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668 (1984), or was based on an unreasonable application of the facts. (R&R at 48.)

The Magistrate Judge next addressed Pettinato's claim that he was incompetent to stand trial. The R&R states, "Petitioner has repeatedly argued that he was in fact incompetent to stand trial.

19

Although this question is subsumed in the discussion of the validity of his guilty plea and the effectiveness of his attorney, out of an abundance of caution, this claim will be additionally considered." (*Id*. at 51-52.) The R&R notes that the PCR court addressed this claim, finding that Pettinato had been psychiatrically examined and found competent to stand trial and that Pettinato had presented no competent medical proof to support his allegation. (*Id*. at 53.) The Magistrate Judge stated that "[b]ecause of the presumption [of correctness] accorded these findings and because Petitioner is unable to present clear and convincing evidence to rebut the presumption, it appears that the state court factual finding that Petitioner was competent during his various proceedings may not be disturbed by this court." (*Id*. at 53-54.)

Petitioner also claims that his attorney misled him concerning the waiver of his right to a direct appeal, but the Magistrate Judge noted the PCR court found as a fact that counsel "advised the Applicant that if he accepted a plea that all issues counsel had preserved for appeal would be waived." (*Id*. at 54.) Magistrate Judge Carr stated that no habeas relief should issue on this ground because (1) Pettinato failed to rebut the presumption of correctness by clear and convincing evidence and (2) "it does not appear that the state court decisions were contrary to, or involved an unreasonable application of clearly established federal law or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." (*Id*. at 56.)

The Magistrate Judge next addressed Pettinato's contention that he is entitled to a new trial because of his contention that the trial court made various reversible errors and that there was misconduct on the part of the Solicitor. (*Id*.) Judge Carr stated, "These claims are not cognizable here because his guilty plea constituted a break in the chain of events which preceded it in the

criminal process and all antecedent assignments of error are waived, save jurisdictional errors." (*Id.* at 57.) He also stated that this court should not reach this claim on the merits, as these errors should have been raised on direct appeal but were not. (*Id.*)

Judge Carr noted that Petitioner "contends that his attempts to pursue relief in state PCRs have been denied arbitrarily by South Carolina's successive application rule and the PCR statute of limitations." (*Id.*) However, Judge Carr stated that "[t]hese types of claims are simply not cognizable in federal habeas corpus proceedings." (*Id.*) Furthermore, while Pettinato complains about the lawyers who represented him in his various PCRs, such claims "are not cognizable pursuant to 28 U.S.C. § 2254(i)." (*Id.* at 57-58.)

**C.     Objections**[1]

In his Objections, Pettinato states that he "objects to the Magistrate Judge's Report and Recommendation . . . in its entire[]ty" but that because he is required to be specific, he sets forth twenty-six objections. (Objections at 1.)[2] The court declines to address Pettinato's broad objection

_____

[1]For ease of discussion, the court will address Pettinato's objections out of the order in which he listed them. Several of Pettinato's objections concern the state court PCR proceedings. The court has reviewed these objections (numbered 3-6) and determined that they do not impact the R&R or this court's ruling. Pettinato also objects to the Magistrate Judge's "apparent failure to incorporate into the record, the documents that Pettinato requested be so incorporated from his 2nd Federal Habeas Petition [Pettinato v. Anthony, C/A No. 2:00-1578-23AJ]." (Objections at 4-5.) Given the breadth of Pettinato's allegations in the instant petition, it is unclear how such an incorporation would further Pettinato's cause. However, the court has reviewed those documents and has determined Pettinato is not entitled to habeas relief.

[2]Several of Pettinato's objections do not warrant in-depth consideration, as they have no bearing upon the Magistrate Judge's analysis or this order. For example, Pettinato states that while Magistrate Judge Carr "correctly noted that Pettinato was indicted at the July 1994 term of court for murder, however, Pettinato was first indicted at the May 1994 term of court for murder and then in July of 1994, he was indicted for murder and one gun charge." (Objections at 1.) The fact that the Magistrate Judge did not indicate that Pettinato was first indicted for murder, then indicted for murder and one gun charge, is of no consequence.

21

to the R&R and instead addresses his specific objections.  *See Smith v. City of N. Charleston*, 401

F. Supp. 2d 530, 533 (D.S.C. 2005); *see also Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

Pettinato first objects to the standard of review applied by the Magistrate Judge.  (Objections

at 5.)  He states,

> Pettinato submits that although the Magistrate Judge cited the correct law regarding
> the standard of review, Pettinato would argue that in <u>Williams v. Taylor</u>, 120 S. Ct.
> 1495 (2000) (plurality opinion), the Court left intact the federal courts['] power and
> duty to disregard state habeas corpus or state PCR denials that can be shown to be
> "wrong" under applicable United States Supreme Court precedent.

(Objections at 5.)  The court finds no error in the Magistrate Judge's explanation of the standard or

its application.  Title 28, Section 2254 provides in relevant part:

> **(a)** The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
> entertain an application for a writ of habeas corpus in behalf of a person in custody
> pursuant to the judgment of a State court only on the ground that he is in custody in
> violation of the Constitution or laws or treaties of the United States.
> . . .
> **(d)** An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>> **(1)** resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>> **(2)** resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the
>> State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362 (2000), on appeal was the interpretation of § 2254 as allowing

federal courts to issue habeas relief "only if the state courts have decided the question by interpreting

or applying the relevant precedent in a manner that reasonable jurists would all agree is

unreasonable."  *Williams*, 529 U.S. at 376 (internal quotation marks omitted).  In discussing the

appropriate standard under § 2254, Justice Stevens stated,

> The maxim that federal courts should give great weight to the considered conclusions of a coequal state judiciary does not mean that we have held in the past that federal courts must presume the correctness of a state court's legal conclusions on habeas, or that a state court's incorrect legal determination has ever been allowed to stand because it was reasonable. We have always held that federal courts, even on habeas, have an independent obligation to say what the law is.
>
> We are convinced that in the phrase, "clearly established law," Congress did not intend to modify that independent obligation.

*Id.* at 383-84 (internal quotation marks and citations omitted). In so stating, however, Justice Stevens was not delivering the opinion of the Court. Instead, Justice O'Connor delivered the Court's opinion with respect to Part II, and the Court thus determined a federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Id.* at 405-06. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies it to the facts of the particular case. *Id.* at 407-08; *see also Bell v. Jarvis*, 236 F.3d 149, 157 (4th Cir. 2000) (noting that the court "may not review Bell's Sixth Amendment claims *de novo*").

In the case *sub judice*, the Magistrate Judge properly stated the standard of review pursuant to 28 U.S.C. § 2254 and properly applied this standard. Accordingly, Pettinato's objection is without merit.

Pettinato also objects to the Magistrate Judge's determination that his guilty plea is valid and that his claims of ineffective assistance of counsel that occurred prior to the plea are waived. (Objections at 8.) He asserts that "[h]is plea was obtained because of the ineffective assistance of counsel, Pettinato's mental incompetence at the time, because of the intentional acts of his lawyer misleading him, as set forth and argued in his filings with this court, and because of the acts of the

23

trial judge." (*Id.*)

The court will first address his objection to the determination that his guilty plea is valid. He stated, "Pettinato objects to the Magistrate's conclusion that Pettinato decided to withdraw his plea of not guilty and plead GBMI." (Objections at 13.) He asserts he "did not **decide** any such thing" but saw "no reason to continue with the trial after the trial judge decided that he was not entitled to a defense, when his lawyer told him [Pettinato] that he would testify for him on appeal if he would just plead guilty, and when he was not permitted to have a psychiatric expert assist him in explaining the symptoms of bipolar disorder and dissociative disorder." (*Id.*) He also objects to the Magistrate Judge's "finding that the transcript of the plea hearing directly contradicts Pettinato's claim of involuntariness and amply supports the PCR court's finding that the plea was valid." (*Id.*) He states,

> The plea hearing merely shows that Pettinato answered questions he was led to believe were a mere formality to gain acceptance of the plea. As repeatedly explained, this was so the trial at which Pettinato was not allowed to have a defense would end, and, his appeal process would begin. No one informed Pettinato that he was admitting that he had committed the elements of murder by entering a guilty plea. Furthermore, as established in the record by Pettinato's many pleadings, the decision was not his alone and was not voluntary. He was not given any constitutionally required choice. Here, he was given the choice of continuing with a trial where he was not allowed a defense, or to simply enter a guilty plea and then go on with an appeal that his lawyer had told him would win him a new trial.

(*Id.* at 13-14.) He also asserts the fact that he had rejected prior plea offers and that he finally "broke down and entered the plea after being told that his lawyer would testify for him on appeal and that there were two strong issues for appeal that would win him a new trial." (*Id.* at 14.) He asserts the fact that he entered a voluntary and valid guilty plea is incredible because "no one has come up with a valid reason for the guilty plea." (*Id.* at 16.)

Just as the Magistrate Judge, the court finds reviewing Pettinato's plea colloquy necessary

24

in order to evaluate his current claim.  The following colloquy occurred:

> MR. THOMPSON: Your Honor, at this point in time during the lunch we have been in negotiations with the solicitor's office.  We wish to at this time withdraw our plea of not guilty and be allowed to plead guilty but mentally ill pursuant to those negotiations.

> THE COURT: All right.  Mr. Pettinato, you have heard what your lawyer has told me.  Do you agree with what he has told me as being correct?

> THE DEFENDANT: Yes, sir.

> THE COURT: And do you wish to withdraw your pleas of not guilty as to each of the charges contained in the indictments to which you have–which you are now standing trial on and wish to enter pleas of guilty but mentally ill as to each of those charges?

> THE DEFENDANT: Yes, sir.

> THE COURT: All right.  Now, there are certain questions that I need to ask you in order to determine that your pleas of guilty are freely and voluntarily made.  That simply means that you have made your decision to plead guilty freely and voluntarily, and that nobody has coerced you or threatened you into arriving at that decision, and that you are doing so intelligently and knowingly.  So there are certain questions I need to ask you.
> Should you wish to respond to those, you may; should you wish not to respond and to continue with your jury trial, you, of course, may also do that.  First, let me ask you, have you had sufficient time and opportunity to talk with your lawyer about your decision to withdraw your plea of not guilty and to enter pleas of guilty to each of these charges?

> THE DEFENDANT: Yes, sir.

> THE COURT: Do you need any additional time to spend with Mr. Thompson with reference to that decision?

> THE DEFENDANT: No, sir.

> THE COURT: Are you satisfied with the services rendered on your behalf by Mr. Thompson?

> THE DEFENDANT: Yes, sir.

> THE COURT: Has he done everything that you have asked him to do?

THE DEFENDANT: Yes, he has.

THE COURT: Has he failed to do anything that you asked for him to do?

THE DEFENDANT: Not to my knowledge.

THE COURT: Has he talked to every person or witness which you have requested that he speak with?

THE DEFENDANT: Yes, sir.

THE COURT: And do you have any complaints about the manner in which he has represented you?

THE DEFENDANT: No.

THE COURT: Now, as you are aware, in order for me to accept your plea of guilty there are certain constitutional rights that you have that you must waive or give up in order to plead guilty.  As you are aware, you have a right to have a lawyer represent you.  Mr. Thompson has represented you throughout these proceedings.

You have a right to confront the state's witnesses that you have enjoyed because each witness who has testified during the course of this trial has been called to testify under oath in your presence from the witness stand.

You also have a right to continue with your jury trial.  That is the remainder of the trial to be accomplished are the final arguments or summations to be accomplished by the lawyers after which I will instruct the jury as to the law.  Then it will be their duty and obligation to deliberate the case, consider the evidence, apply the law and arrive at a verdict.

Of course the jury may find you guilty or not guilty as to any, all or–any or all of these charges.  Now, do you understand that you also have the right to continue with your jury trial and have the jury determine whether or not you are guilty of any or all of these charges?

THE DEFENDANT: Yes, sir.

THE COURT: Have you had sufficient time and opportunity to discuss with Mr. Thompson your decision to forgo or waive your right to have the jury make that determination, that is the determination of your guilt?

THE DEFENDANT: Yes, sir.

THE COURT: And it is your decision to give up your right for the jury to make that determination and to plead guilty?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that if I accept your plea of guilty that the jury which is now back in the jury room will not make a determination as to whether or not you have been proven guilty, but if I accept your pleas of guilty, they will be released and will have no further duties or obligations in this trial?

THE DEFENDANT: Yes, sir.

THE COURT: And is that what you wish for me to do?

THE DEFENDANT: Yes, sir.

THE COURT: Now, do you also understand that the burden is upon the state or solicitor to convince those 12 jurors beyond a reasonable doubt that you are guilty before they could find you guilty.

THE DEFENDANT: Yes, sir.

THE COURT: And you do not wish for the state to bear that burden of proof any longer?

THE DEFENDANT: No, sir.

THE COURT: All right, sir. Has anybody promised you anything in order to induce you to plead guilty, that is to get you to plead guilty to these charges?

THE DEFENDANT: No, sir.

MR. THOMPSON: It is a negotiated plea, Your Honor.

THE COURT: All right. Tell me about the negotiations.

MR. THOMPSON: Your Honor, the negotiations as I understand them to be are that we be allowed to plead guilty but mentally ill on the four charges; that the possession or use of a weapon during the commission of a violent crime, the sentence on that will be run concurrent with the sentence on the murder charge.

Your Honor, I haven't had a chance to research this. There were no negotiations as to the sentence on the other charges except that everything would run concurrent, but, quite frankly, Your Honor, I believe the law would not allow the Court to issue a sentence on those two charges.

THE COURT: Well, let me ask Solicitor Bulsa. Mr. Bulsa are you amenable to upon my acceptance of Mr. Pettinato's guilty pleas to murder and possession of a firearm

27

during the commission of a violent crime, to dismiss the indictment for pointing a firearm and carrying a pistol?

MR. BULSA: Yes, sir.

THE COURT: In that pointing a firearm is necessarily included in the offense of murder since it was accomplished by the use of a pistol, and carrying a pistol obviously is included in the crime of possession of a pistol during the commission of a violent crime in that all the elements are the same except for the presence of a violent crime being committed–

MR. BULSA: Yes, sir.  We indicated that case we knew the situation with a plea being accepted.

THE COURT: All right.  So you intend to dismiss the indictment, 94-4850, upon my acceptance of his guilty pleas on 94-3042 being the charge of murder and possession of a firearm during the commission of a violent crime.

MR. BULSA: Yes, sir.

THE COURT: All right.  Are there any other negotiations that were involved in this agreement?

MR. THOMPSON: No, sir, there are none other.

THE COURT: Mr. Pettinato, have you heard the discussions between myself and your lawyer and the solicitor with respect to the negotiated guilty pleas?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand the terms of that agreement?

THE DEFENDANT: Yes, sir, I do.

THE COURT: What the solicitor and Mr. Thompson have told me is that they are–the solicitor is allowing you to plead guilty but mentally ill to the charge of murder which is count one of the indictment 94-3042 and also plead guilty but mentally ill as to count two of that same indictment which is possession of a firearm during the commission of a violent crime, murder being defined under South Carolina law as a violent crime.

      In return for your pleading guilty but mentally ill as to those two charges, upon my acceptance of your guilty pleas as to that indictment the solicitor is agreeing to dismiss or nolle pros indictment 94-4850 which is the indictment for pointing a firearm in count one and carrying a pistol in count two.  Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And in addition, as I understand it, the only other term of that agreement or negotiated plea is that the solicitor is recommending that the sentences on indictment 94-3042 will be run concurrently, that is at the same time, whatever sentence I impose will be running at the same time rather than consecutively. Now, was that your understanding of the plea negotiations which have been entered into between you and your lawyer and the solicitor?

THE DEFENDANT: Yes, sir.

THE COURT: Do you have any different understanding of those plea negotiations?

THE DEFENDANT: No, sir.

THE COURT: Was that your full understanding of the negotiations?

THE DEFENDANT: Yes, sir.

THE COURT: And do you agree with those conditions?

THE DEFENDANT: Yes, sir.

THE COURT: And understanding that, do you still wish to plead guilty to the charges as you have indicated?

THE DEFENDANT: Yes, I do.

THE COURT: Now, other than those plea negotiations, have you been promised anything in order to induce you to plead guilty?

THE DEFENDANT: No, sir.

THE COURT: Have you been threatened in any way or coerced in any fashion by any person in order to get you to plead guilty?

THE DEFENDANT: No.

THE COURT: Are you pleading guilty freely and voluntarily?

THE DEFENDANT: Yes, sir.

THE COURT: And was it your decision to plead guilty to each of these charges, and your decision alone?

THE DEFENDANT: Yes, sir.

. . .

THE COURT: All right, sir.  Solicitor, as I understand it, Mr. Pettinato is pleading guilty to murder and possession of a firearm during the commission of a violent crime, and pleading guilty but mentally ill.  Is it the position of both the state and the defense that you are agreeing to stipulate to the fact of the mental illness, and, therefore, the plea of guilty but mentally ill?

MR. BULSA: Yes, sir, based upon the testimony of both doctors that he has been suffering a mental illness.  We do feel the jury could find that, and we will stipulate.

THE COURT: All right.  Based upon the testimony of the doctor and the other evidence presented as well as the stipulation of the parties, I find that at the time the offenses were committed Mr. Pettinato was suffering from a mental illness or disease or defect which would prevent him from being able to conform his conduct to the requirements of the law.

I will accept your pleas of guilty but mentally ill as to the charge of murder and the charge of possession of a firearm during the commission of a violent crime.  I'll be glad to hear from you and Mr. Thompson.

MR. THOMPSON: . . . I don't know that there is anything else that we need to tell the Court.  I have explained to Mr. Pettinato that even under this guilty but mentally ill plea that he is going to receive a life sentence and would not be eligible for parole for a 20-year period.  That would be his first eligibility, and he does seem to understand that.  I have also explained to him that under this recommendation that five years, mandatory five years, will be run concurrent with that life sentence as opposed to being tacked on at the end.  He does understand that.

THE COURT: Mr. Pettinato, you have heard what your lawyer has told me.  Do you have anything you would like to add to it?

THE DEFENDANT: No, no, Your Honor.

. . .

THE COURT: Mr. Thompson, let me ask, are you satisfied with the time that you have spent with Mr. Pettinato that his decision to plead guilty to these charges is freely and voluntarily made?

MR. THOMPSON: Yes, sir, I am satisfied of that.

THE COURT: And have you gone over with him his constitutional rights as I have

explained them to him?

MR. THOMPSON: Many times, Your Honor.

THE COURT: And have you gone over with him the consequences of his pleading guilty to these charges or being found guilty of these charges?

MR. THOMPSON: Yes, sir, including the fact that any issues that may be for appeal that came up during the course of the trial, with his pleading guilty, he is now waiving those issues. I have explained that to him also.

THE COURT: Do you understand that, Mr. Pettinato?

THE DEFENDANT: Yes, sir.

THE COURT: Do you still wish to plead guilty?

THE DEFENDANT: Yes, I do.

(Trial Tr. 382-93.)

In the R&R, Judge Carr stated that "[t]he transcript of the plea hearing . . . directly contradicts Petitioner's claim of involuntariness and amply supports the PCR court's finding that the plea was valid." (R&R at 45.) Although it does not appear his first petition for post-conviction relief specifically sought relief on the grounds that his plea was involuntary, the PCR court did determine Pettinato's plea was knowing and voluntary.[3] The order of dismissal states, "This Court finds that the transcript and the testimony at the post-conviction relief hearing clearly reflects that the Applicant's pleas were knowingly and voluntarily entered according to the mandates of <u>Boykin v. Alabama</u>, 395 U.S. 238 (1969) and later cases developing that doctrine." (App. 520.)

The court agrees with the Magistrate Judge. Aside from Pettinato's allegations that his plea

---

[3]Furthermore, Pettinato admits that Grounds A through F, which includes the claim that his plea was not entered into knowingly and voluntarily, were all raised in his first PCR action and were denied on the merits. (Resp. in Opp'n to Second Mot. for Summ. J. at 17.)

was involuntary, there is no evidence that his plea was in fact involuntary.  On the contrary, the plea colloquy reveals that his plea was indeed voluntary: it reveals that he had sufficient time to consult with his attorney, he knew he was waiving the right to continue with his jury trial, and he had not been promised anything in order to plead guilty.  Such statements reveal Pettinato's claim that his plea was involuntary is meritless.  *See United States v. Solomon*, 106 Fed. App'x 170, 171 (4th Cir. 2004); *United States v. Robinson*, 82 Fed. App'x 322, 323 (4th Cir. 2003) ("Robinson's plea colloquy reveals that his plea was knowingly and voluntarily entered into."); *United States v. DeFusco*, 949 F.2d 114, 119-20 (4th Cir. 1991).  In any event, Pettinato is unable to demonstrate that the state court's determination that his plea was voluntary was contrary to or involved an unreasonable application of federal law, or resulted in a decision that was based on an unreasonable determination of the facts based on the evidence presented.  *See* 28 U.S.C. § 2254(d); *see also Hunter v. Mauney*, No. 0:06-1765-HMH-BM, 2007 WL 528060, at *4 (D.S.C. Feb. 14, 2007); *Johnson v. Smith*, 981 F. Supp. 944, 948-49 (D. Md. 1997).[4]

---

[4]To the extent Pettinato is arguing that his plea was involuntary because counsel lied and told him that counsel would file an appeal for Pettinato, the plea colloquy reveals that claim to be meritless, as it indicates that counsel told Pettinato that he would be losing the issues for appeal that occurred prior to the entry of the plea.  Furthermore, the state PCR court stated, "This Court finds as a fact that trial counsel advised the Applicant that if he accepted a plea that all issues counsel had preserved for appeal would be waived."  (App. 518.)  The state PCR court also found that counsel advised Pettinato that there were two strong issues for appeal.  (*Id.*)  Such a determination is not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Pettinato also asserts his plea is involuntary because "no one has come up with a valid reason for the guilty plea."  (Objections at 16.)  However, the state PCR court determined that counsel explained to Pettinato there was no benefit to pleading guilty but mentally ill as opposed to guilty except as it related to parole.  (App. 511.)  The state PCR court stated, "The benefit of the plea was that on the second count on a murder charge, if he got a life sentence and consecutive time he would never be eligible for parole. . . .The benefit of the plea to the Applicant was that the State would recommend concurrent time and the Applicant would be parole eligible.  Counsel explained this to the Applicant and he appeared to understand."  (*Id.*)  Pettinato's claim is thus without merit, as he

After determining that Pettinato's plea was voluntary, the Magistrate Judge then assessed whether Pettinato's trial counsel was ineffective in relation to the plea. (*See* R&R at 46.) As the Magistrate Judge noted, the state PCR court thoroughly addressed Pettinato's claims of ineffective assistance of counsel. The state PCR court's order of dismissal states:

> This Court finds as fact that when counsel first met with the Applicant at jail he was not able to conduct a discussion with the Applicant due to his mental state. Therefore, counsel had the Applicant sent to the State Hospital for an evaluation. The Applicant was kept there for several weeks and the hospital regulated his medications. After that, counsel was able to engage in reasonable discussions with the Applicant. This Court finds that there were discussions between counsel and the Applicant regarding the independent psychiatric examination by either Bierman or Smith. This Court finds that the Applicant's mother contacted counsel early in his representation and asked that he have the Applicant evaluated for adult attention deficit disorder. This Court finds that counsel talked with psychiatrists Bierman and Smith to determine whether they could assist in the Applicant's defense. However, both psychiatrists indicated that they could not and counsel discussed this fact with the Applicant. This Court finds that the Applicant's mother had a doctor who was willing to evaluate the Applicant and that the mother was willing to pay for the evaluation; however, she wanted to know if the court would allow the evaluation. Counsel advised the mother that if she could get a tentative appointment he would investigate whether the court would allow the evaluation. However, counsel never heard back from the mother.
>
> This Court finds that counsel pursued a defense of not guilty by reason of insanity because there was no other defense to present. The Applicant had admitted shooting his wife. At the State Hospital, the Applicant was diagnosed as dysthmic with mild chronic depression. However, the hospital found that the Applicant was able to conform his conduct. Thereafter, counsel discovered that the Applicant had been seen at the local mental health. Counsel used Dr. Smith at the local mental health as an expert. Dr. Smith would not testify that the Applicant was not criminally responsible as an expert witness; however, counsel was able to put up the Applicant's actions to support that defense through the witness. Counsel questioned Dr. Smith about the symptoms the Applicant displayed to establish the Applicant's mental instability. In response to Dr. Smith's testimony, the State put up Bierman in rebuttal. On cross-examination, counsel was able to get Bierman to admit that there was a possibility that the Applicant was not in touch with reality and could not

is unable to establish this determination is contrary to, or involved an unreasonable application of federal law, or was based on an unreasonable application of the facts in light of the evidence presented at the state court proceeding. *See* 28 U.S.C. § 2254.

33

conform or did not know moral right from legal wrong.  Thereafter, the State again presented a plea offer to the Applicant.  A plea offer had been made to the Applicant originally which the Applicant rejected.  The Applicant counseled with his attorney and his family and advised at all times that the decision to plead was his own. Counsel explained to the Applicant that there was no benefit to a guilty but mentally ill plea as opposed to a guilty plea, except as it related to parole.  The benefit of the plea was that on the second count on a murder charge, if he got a life sentence and consecutive time he would never be eligible for parole.  Counsel had conferred with Carl Lundberg of the South Carolina Department of Probation, Parole and Pardon Services on this issue.  The benefit of the plea to the Applicant was that the State would recommend concurrent time and the Applicant would be parole eligible. Counsel explained this to the Applicant and he appeared to understand.

This Court finds that counsel had no problem communicating with the Applicant once he was back from the State Hospital.  This Court finds that the Applicant had discovered before trial that if he got off his medications his mental illness would come back.  Counsel advised the Applicant to remain on his medications.  This Court finds that counsel did not notice any mental deficiencies in the Applicant two (2) to three (3) weeks before trial.

(App. 509-12.)[5]  The state PCR court also found that counsel "spent many hours at the jail on many occasions talking with the Applicant about his insanity defense.  Counsel advised the Applicant that this defense was a long shot but that he had no other defense."  (*Id*. at 512.)  The state PCR court also found that in chambers, counsel asked the trial court to charge the jury on voluntary manslaughter.  (*Id*.)  The state PCR court continued, "This Court finds that counsel researched the manslaughter issue for hours and could find no legal support for a manslaughter charge.  This Court finds that counsel never led the Applicant to believe that a manslaughter charge was a viable option because there was no act of provocation on the part of the victim."  (*Id*. at 513.)  The state PCR court found "that the attorney for the Applicant was diligent in his representation of the Applicant, performed well within the range of competence demanded of attorneys in criminal matters and performed within the wide range of reasonable professional assistance."  (*Id*. at 514.)  The state PCR

---

[5]It appears the correct spelling of the physician's name is Dr. Behrmann.

court thus found that Pettinato could not establish that his counsel's performance was deficient or that he was prejudiced by any such performance. (*Id.*)

In his R&R, the Magistrate Judge stated that the "trial record and the PCR hearing testimony fully support the PCR judge's conclusion that Petitioner had failed in his burden to show that his lawyer's performance was constitutionally infirm." (R&R at 51.) In his Objections, Pettinato "objects to the Magistrate Judge's finding that Pettinato's ineffective assistance of counsel claims that occurred prior to the plea are waived." (Objections at 8.) However,

> [i]neffective assistance of counsel claims may be asserted in limited circumstances where the petitioner has entered a plea of guilty. A guilty plea generally precludes the petitioner from challenging defects in the process which occurred prior to the plea. He "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). When such a claim is raised, the voluntariness issue is subsumed within the claim of effectiveness of the attorney's assistance.

*Brown v. Weedon*, No. 3:06-2465-PMD-JRM, 2007 WL 2477335, at *12 (D.S.C. Aug. 28, 2007); *see also United States v. Parker*, 176 Fed. App'x 358, 359 (4th Cir. 2006) ("As Parker's guilty plea was valid, he waived all antecedent nonjurisdictional defects . . ." (*citing Tollett v. Henderson*, 411 U.S. 258, 266-67 (1973)); *Johnson v. Moore*, 164 F.3d 624, at *6 (4th Cir. 1998) (unpublished table decision) (noting the general rule that "guilty pleas, freely and voluntarily entered, act as a waiver of all non-jurisdictional defects and defenses," including a claim of ineffective assistance of counsel (internal quotation marks omitted)); *Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1296 (4th Cir. 1992) ("A guilty plea does not bar collateral review of allegations of ineffective assistance of counsel in so far as the alleged ineffectiveness bears on the voluntariness of the guilty plea.").

As the Magistrate Judge noted in the R&R, the state PCR court thoroughly addressed Petitioner's claim of ineffective assistance of counsel. The Magistrate Judge stated, and this court

agrees, that Petitioner has not established that the state court's decision was contrary to, or involved an unreasonable application of *Strickland* or was based on an unreasonable application of the facts in light of the evidence presented at the state court proceeding. (*See* R&R at 51.) Pettinato argues that the ineffective assistance of counsel prior to the plea is what caused the plea. (Objections at 8.) Specifically, Pettinato asserts his attorney "failed to investigate and keep Pettinato informed regarding the exculpatory evidence in the form of the gunshot residue test results and the witness statements." (*Id*. at 8-9.) Pettinato presents a report from the South Carolina Law Enforcement Division ("SLED") which states, "The quantities of metals detected in samples submitted from the hands of Mitchell Pettinato are insufficient to determine the presence of gunshot residue." (Am. Pet. Ex. [10-4] at 2.) He also points to two witness statements describing the shooter as a white male who was 5 feet and 11 inches tall. (Am. Pet. Ex. [10-8] at 1-2.) He asserts this evidence is exculpatory because he is 6 feet and 1 inch tall. (*See* Pettinato Aff. at 5.)

These two statements were given by Carol Poirier and Barbara Dennis. Ms. Poirier stated that she heard the shooter tell Sandy Pettinato two or three times that "[a]ll I want is Michael." (Am. Pet. Ex. [10-8] at 1.) She also stated that the shooter looked at her and told her, "I'm not after you" and that her husband recognized the shooter as Sandy's ex-husband. (*Id*.) Ms. Dennis's statement indicates (1) she heard the shooter say "next time you won't be messing with a black man" and (2) she had seen the shooter around 2 A.M. that morning at her door. (*Id*. at 2.) Debra Gene Ford's statement indicates that she heard someone knocking on her door and went to the window, where she saw Michael Pettinato pointing a gun at her door.[6] She states that she saw "Michael" start

---

[6]Several of the statements refer to "Michael Pettinato." However, these statements also refer to the shooter as Sandy Pettinato's ex-husband.

shooting and heard him state, "I told you I was gonna get you you . . . nigger loving bitch." (*Id.* at 4.) While she indicates that "Michael" was wearing a blue ball cap, she saw another person with a red ball cap in the parking lot who also "ran off." (*Id.*)

Ms. Poirier testified at trial, and she recounted essentially the same facts, and the following exchange occurred:

Q.    Is that man [the shooter] in the courtroom?

A.    Yes, he is.

Q.    Do you recognize him? Where is he?

A.    Sitting over there.

Q.    Sitting over there?

A.    Yes.

(Tr. Transcript 153-54.) Debra Jean Ford also testified at trial; she stated that she knew Sandy's husband and was aware of the problems that Sandy and Mitchell Pettinato had been having. (*Id.* at 155-56.) The following exchange occurred during her testimony:

Q.    What did you do when you heard the knocking?

A.    I got up out of bed and went to the window. By this time he was in behind my son's motorcycle arguing. . . .

Q.    So you heard the knocking and looked out the window. What did you see?

A.    I saw him standing in behind my son's motorcycle.

Q.    You saw him out in the parking lot.

A.    Yes, sir.

. . .

Q.      And that's where you say you saw him standing.  When did you see the gun?

A.      He had walked up in behind the motorcycle and apparently he had been arguing with her earlier because when I got to the window he had pulled the gun out from right in here and he pointed the gun toward my apartment and–

Q.      When did he shoot? Did you hear a shot? Where was he standing when you heard that shot?

A.      Behind the motorcycle.

(*Id*. at 156-58.)

To the extent that Pettinato is arguing his guilty plea was involuntary because his attorney failed to present to him and discuss exculpatory evidence with him, that argument is without merit. Pettinato seems to now assert that he is actually innocent of the crime of which he was convicted, but he admitted that he told Michael Rice that if he "ever caught them together again that [he] would kill them both."  (*Id*. at 276.)  He also admitted that on the morning of April 9, he saw his wife Sandy at the Woodside apartments and that after arguing, he pulled a gun out and shot her.  (*Id*. at 296-97.)

Assuming that Pettinato's attorney did not discuss this evidence with him, the court finds Pettinato is unable to establish the prejudice prong of *Strickland*.  The gunshot residue test was inconclusive–while the quantities of metals detected in samples submitted from Pettinato's hands were insufficient to determine the presence of gunshot residue, the results of the test did not indicate that Pettinato could not have been the shooter.  Furthermore, evidence of Pettinato's guilt was overwhelming.  Even assuming the two-inch difference in the description of the shooter and

Pettinato's height is significant, Ms. Poirier and Ms. Ford identified Pettinato as the shooter. [7] Pettinato himself admitted that he shot Sandy Pettinato, and at the plea hearing, he indicated that he had not been promised anything to plead guilty, he had not been threatened or coerced into pleading guilty, and that it was his decision alone to plead guilty. (Tr. 389.) At the PCR hearing, Mr. Thompson, Pettinato's counsel, indicated that he pursued a defense of not guilty by reason of insanity and stated, "[Q]uite frankly, we had really no other defense to present. Mr. Pettinat[o] had admitted shooting his wife." (App. 484.) Given this evidence, the court finds Pettinato has not established the prejudice prong of *Strickland*, and counsel's alleged failure to discuss this evidence with Pettinato did not render his plea involuntary. In order to establish ineffective assistance in the context of a guilty plea, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Pettinato has made no such showing.

Pettinato next objects to the Magistrate Judge's determination that Pettinato has "repeatedly argued that he was actually not guilty because he was insane." (Objections at 20.) Pettinato states, "Pettinato merely argued that he was not mentally competent to stand trial, plead guilty, and to waive his Federal Constitutional rights." (*Id.*) The court will thus address this argument that he was not competent to stand trial and plead guilty.

In *Dusky v. United States*, 362 U.S. 402, 402 (1960), the Court held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his

---

[7]Mr. Pettinato makes much of the fact that a witness indicated she saw another man fleeing from the scene. In her statement, Ms. Ford indicated that she "believe[s]" she saw another man in the parking lot behind "Michael" and that this man fled the scene. (Am. Pet. Ex. [10-8] at 4.) However, such evidence is not exculpatory as Ms. Ford identified the shooter as "Michael" Pettinato. (*Id.*)

lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." The Supreme Court held this standard also applied in the context of a guilty plea. *Godinez v. Moran*, 509 U.S. 389 (1993). The Court reiterated in *Godinez* that "[a] finding that a defendant is competent to stand trial . . . is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel." *Id*. at 400. "In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Id*.

The Magistrate Judge addressed Pettinato's claim that he was not competent to stand trial. The R&R states, "Although this question [of whether Pettinato was mentally competent to stand trial] is subsumed in the discussion of the validity of his guilty plea and the effectiveness of his attorney, out of an abundance of caution, this claim will be additionally considered." (R&R at 51-52.) As the Magistrate Judge noted, this claim was considered by the state PCR court; that court stated,

> In his twenty-first allegation, the Applicant alleges that he was not mentally competent to plead guilty. This Court finds that the Applicant was psychiatrically examined and found competent to stand trial and to assist in his defense. Further, the Applicant has not produced any competent medical proof to support this allegation. Therefore, this allegation lacks merit. This Court finds that this allegation is conclusively refuted by the record before the Court.

(App. 519-20.) In his R&R, Judge Carr stated,

> These findings of fact of the state courts are fully supported by the record and are entitled to a presumption of correctness in these federal habeas corpus proceedings. 28 U.S.C. § 2254(e)(1). Because of the presumption accorded these findings and because Petitioner is unable to present clear and convincing evidence to rebut this presumption, it appears that the state court factual findings that Petitioner was competent during his various proceedings may not be disturbed by this court.

(R&R at 53-54.)

The court agrees with the Magistrate Judge.  At the state PCR proceeding, Pettinato's trial counsel, Don Thompson, testified that he was concerned about Pettinato's competency and sent him to the state hospital for evaluation.  (App. 477.)  Mr. Thompson further testified that while he was concerned about Pettinato's competency, Dr. Behrmann determined that Pettinato "was competent and capable of going forward."  (*Id*.)  Mr. Thompson also stated,

> We did not discuss obtaining an independent psychiatric examination of the type that Dr. Behrmann had given or the type that Dr. Smith had done at the local mental health.
> His mother contacted our office.  In fact, I guess it may be Mr. Sanders' writing.  I'm not sure.  Had contacted our office early in our representation of Mr. Pettinat[o] before I was ever assigned to the case even and wanted to have him evaluated for attention deficit disorder, adult attention deficit disorder.  There are several documents that she has sent to me concerning adult attention deficit disorder.
> I talked with the doctors.  I talked with Dr. Behrmann, I talked with Dr. Smith, concerning that.  With that–if he were suffering from attention deficit disorder, would that help us in our not guilty by reason of insanity.  Both of them indicated to me no, it would not.

(*Id*. at 483-84.)  This court finds the state PCR court's determination that Pettinato was competent to stand trial and plead guilty was not contrary to or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented.  Although Pettinato claims he was not competent, Pettinato still fails to offer any medical evidence that he was in fact not competent.  The court therefore agrees with the Magistrate Judge that Pettinato is not entitled to relief on this ground.[8]

---

[8]Furthermore, to the extent Pettinato argues his counsel was ineffective for failing "to obtain an expert in psychiatry to assist the defense with respect to Petitioner's competency to stand trial and sanity at the time of the alleged offense after being requested to obtain same and when an expert was available and willing to assist Petitioner," the court finds that argument to be without merit. (*See* Am. Pet.) Counsel had Pettinato evaluated for competency, and he was found competent.  To the extent Pettinato's argument implies counsel had a duty to "shop around" for another opinion, that argument is without merit.  *See Roach v. Martin*, 757 F.2d 1463, 1477 (4th Cir. 1985).  And while Pettinato's mother sought to have Pettinato evaluated for adult attention deficit disorder, counsel

Pettinato next objects to the Magistrate Judge's "findings that Pettinato is not entitled to any relief on any ground that could have been raised on appeal and that Pettinato defaulted his claims by not appealing." (Objections at 22.) Pettinato "again asserts that he did not default on anything." (*Id.*) He argues he wanted to appeal, his attorney knew he wanted to appeal, and that there was no waiver of the right to appeal. (*Id*) He states,

> As the State would have it, it can deny Pettinato a trial by very simply having its judge decide not to allow the alleged sole defense to go to the jury thereby coercing a guilty plea, it can then deny Pettinato an appeal by having Pettinato's lawyer fail to appeal and then appear at a PCR hearing to falsely state that Pettinato did not want an appeal.

(*Id*. at 22-23.)

This objection is without merit. The plea colloquy itself reveals Pettinato was aware that he was waiving certain appellate rights. In addition, trial counsel testified at the state PCR proceeding that on the day Pettinato pled guilty, counsel informed Pettinato that by pleading guilty, all the issues counsel had preserved for appeal would be lost. (App. 490.) Counsel also testified that there were two strong issues for appeal that would be lost. (*Id.*) The state PCR court addressed Pettinato's argument that he did not waive his right to appeal; it rejected this argument and found that counsel

---

asked Dr. Berhmann and Dr. Smith if such a diagnosis would help with the insanity defense, and both doctors responded in the negative. Such performance is not deficient, and the state court's adjudication of this claim did not result in a decision that was contrary to, or involved an unreasonable application of clearly established federal law or was based on an unreasonable application of the facts in light of the evidence before the state PCR court. Accordingly, Pettinato is not entitled to habeas relief on this ground.

In Pettinato's Objection Number 21, he objects to the Magistrate Judge's recitation of certain facts. For example, he states, "Pettinato o[b]jects to the Magistrate's recitation of the alleged facts as stated by the Respondent, that counsel testified that he had no problem communicating with Pettinato after he [Pettinato] returned from the state hospital." (Objections at 21.) These objections are without merit, however, as they involve factual determinations made by the state PCR court, and these factual determinations are not based on an unreasonable application of the facts as there is evidence in the record to support such determinations. *See* 28 U.S.C. § 2254(e).

specifically advised Pettinato that a guilty plea would waive all issues counsel had preserved for appeal. (*Id.* at 518.) The state court's adjudication of his claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. Pettinato's objection is thus without merit.

Pettinato's Objection Number 23 is an objection to the Magistrate Judge's "determination, without more, that PCR matters are not cognizable in federal habeas actions." (Objections at 24.) In his R&R, Magistrate Judge Carr stated, "Petitioner contends that his attempts to pursue relief in state PCRs have been denied arbitrarily by South Carolina's successive application rule and the PCR statute of limitations. These types of claims are simply not cognizable in federal habeas corpus proceedings." (R&R at 57.) Magistrate Judge Carr is correct–"claims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal *habeas corpus* relief." *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988); *see also Kirby v. Dutton*, 794 F.2d 245 (6th Cir. 1986); *Vazquez v. Rushton*, No. 4:06-cv-01302-GRA, 2007 WL 2822430, at *15 (D.S.C. Sept. 26, 2007) ("[D]eficiencies in a post-conviction proceeding are not cognizable under 28 U.S.C. § 2254."). Pettinato's objection is thus without merit.

Pettinato's Objection Number 24 "objects to the Magistrate Judge's failure to address each ground raised in the Amended Petition and raised by implied consent of the parties." (Objections at 25.) He argues the Magistrate Judge failed to address the following grounds for relief:

> A. Whether Pettinato was denied the effective assistance of counsel where counsel failed to obtain an expert in psychiatry to assist the defense;
> B. Whether Pettinato was denied the effective assistance of counsel where counsel stipulated to Pettinato's competency to stand trial;
> C. Whether Pettinato is being confined in violation of Due Process where the state court lacked jurisdiction to accept the guilty plea.

43

(Objections at 25.)  This court has already addressed Pettinato's claim that he was denied the effective assistance of counsel where counsel failed to obtain an expert in psychiatry and has found that claim to be without merit.  Pettinato also argues his counsel was ineffective for stipulating to Pettinato's competency to stand trial.  Pettinato did not make this argument in his first state PCR proceeding, and thus it appears this court should not consider the claim.  However, even if this court considers this claim on the merits, the court finds it to be without merit.  As previously noted, while Pettinato vehemently argues he was not competent to stand trail, he has yet to present any medical evidence to support that claim.  Furthermore, to the extent Pettinato is arguing his counsel was ineffective because he failed to seek an opinion that Pettinato was not competent to stand trial, that argument is without merit.  Thompson had concerns about Pettinato's competency and had him evaluated, and Dr. Behrmann determined Pettinato was competent to stand trial.  Pettinato is thus unable to establish that his counsel was ineffective pursuant to *Strickland*.

Pettinato also objects to the Magistrate Judge's failure to discuss the state court's lack of jurisdiction to accept the guilty plea.  Much like (B), Pettinato did not make this argument in state court, and this court thus need not address the claim.  However, "this claim does not present a cognizable federal habeas claim since the petitioner has alleged it as an issue of subject matter jurisdiction and thus a pure state law issue." *McCray v. Maynard*, No. Civ. A. 602-083819AK, 2002 WL 32078935, at *6 (D.S.C. Aug. 20, 2002) (citing *Wright v. Angelone*, 151 F.3d 151 (4th Cir. 1998)).  Pettinato's objection is thus without merit.

Pettinato objects "to the fact that he was led to believe that a hearing would be held in this matter and the fact that no hearing was forthcoming."  (Objections at 26.)  Several of Pettinato's Objections make this argument, and the objection stems from a hearing held before Magistrate Judge

Carr on October 26, 2006.  According to Pettinato, he told Magistrate Judge Carr that he was preparing a motion for a hearing but that he stopped preparing the motion and did not file it because Judge Carr told him that he would automatically receive a hearing on the merits of his § 2254 petition.  Such an allegation is entirely baseless.  The undersigned has listened to the tape of the hearing held on October 26, and Magistrate Judge Carr did not inform Petitioner that a hearing was automatic.  Magistrate Judge Carr did explain the procedure to Pettinato and informed him that if all claims were subject to summary dismissal, no hearing would be forthcoming.  However, Judge Carr told Pettinato that if at least one claim was not subject to summary dismissal, the court would hold a hearing on the claims not subject to summary dismissal.  Pettinato's objections concerning Judge Carr's statements at the October 26 hearing are thus without merit.  Having thus considered all of Pettinato's arguments, the court finds he is not entitled to habeas relief.

## CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that Respondent's Motion for Summary Judgment is **GRANTED**.

**AND IT IS SO ORDERED**.

_____
PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**November 15, 2007**

## NOTICE OF RIGHT TO APPEAL

Petitioner is hereby notified that he has the right to appeal this Order within thirty (30) days from the date hereof, pursuant to Federal Rules of Appellate Procedure 3 and 4. *See* Fed. R. App. P. 3-4.

46